# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Camille Sturdivant,**

   **Plaintiff,**

**v.**               **Case No. 18-cv-2661-JWL**

**Blue Valley Unified School District,**
**USD 229; Amy Pressly; and Carley Fine;**

   **Defendants.**

## MEMORANDUM & ORDER

Plaintiff, a former student at a public high school in Overland Park, Kansas, filed this lawsuit asserting claims of race discrimination and retaliation by the school district in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d and claims of race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution by all defendants under 42 U.S.C. § 1983.  This matter is presently before the court on defendants' motions for summary judgment on all claims.  As will be explained, the School District's and Amy Pressly's motion for summary judgment (doc. 133) is granted and defendant Carley Fine's motion for summary judgment (doc. 141) is denied.[1]

## I. Facts

---

[1] In the pretrial order, plaintiff also asserted a § 1983 claim against Kevin Murakami.  Mr. Murakami filed a motion for summary judgment on that claim.  In response, plaintiff voluntarily dismissed her claim against him.  Thus, Mr. Murakami's motion for summary judgment (doc. 139) is moot.  In her submissions responding to the remaining motions for summary judgment, plaintiff concedes that her claim against Mr. Murakami is barred by the statute of limitations.

The following facts are stipulated in the pretrial order, uncontroverted, or related in the light most favorable to plaintiff as the nonmoving party.[2]  Defendant Blue Valley School District, USD 229 is a Kansas public school district.  The District employs Dr. Amy Pressly as a building principal assigned to Blue Valley Northwest High School in Overland Park, Kansas.  Plaintiff, Camille Sturdivant is an African-American female who was a student at Blue Valley Northwest High School from August 2014 through May 2018, when she graduated.  During her sophomore, junior and senior years of high school, plaintiff was a member of the school's "Dazzlers" dance team.  Defendant Carley Fine, who is Caucasian, was employed by the District as an assistant coach of the Dazzlers beginning in the summer of 2016, or just before plaintiff's junior year.  She was promoted to head coach of the Dazzlers in early 2017.   Kevin Murakami provided choreography services for the Dazzlers from the fall of 2015 until May 2, 2018.  Mr. Murakami was not employed by the District; he was an independent contractor.

In the summer of 2016, the members of the Dazzlers auditioned for a contemporary dance routine that the Dazzlers would perform during the upcoming school year and at a national dance competition in Orlando, Florida in March 2017.   At that time, Jenni Waters was the head coach of the Dazzlers.  After the auditions, Coach Waters, defendant Fine and Mr. Murakami met

---

[2] The parties stipulated to numerous facts in the pretrial order.  In response to defendants' motions for summary judgment, plaintiff attempts to now dispute several of those facts.  The court has disregarded those attempts. *See Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 677 (2010) (party is bound by the factual stipulations it submits).  Moreover, the School District and Ms. Pressly have improperly inserted language into one stipulation and the court has disregarded that modification as well. *See* Doc. 134, SOF ¶ 38 and plaintiff's response thereto.  Finally, defendant Carley Fine asserts that the court should strike the affidavits of plaintiff and Melodie Sturdivant because those affidavits contradict the prior deposition testimony of plaintiff and Mrs. Sturdivant.  The court perceives no discrepancy and has considered those affidavits in resolving the motions unless otherwise noted.

plaintiff in the hallway outside the room where auditions had taken place.  Coach Waters told plaintiff that she had not been selected for the dance.  According to plaintiff, she was told that she needed to work on her technique but that she had been named first alternate for the dance in the event of a subsequent opening for the dance.  Plaintiff avers that, after the discussion about her technique, Mr. Murakami added that her "skin color would clash with the costume and that [she] would draw attention from the other dancers because of [her] skin color."  She further testified that this remark was Mr. Murakami's "only contribution" to the conversation.[3]  Mr. Murakami vigorously denies making this statement.  According to plaintiff, defendant Fine remained silent after Mr. Murakami's alleged statement.  Plaintiff's deposition testimony is inconsistent about whether Coach Waters knew about this purported remark.  At one point, plaintiff testified that she did not report the remark to Coach Waters because she did not want to "bring that onto Jenni that that was something that had happened."  But she also testified that Coach Waters was "standing to the side" in the hallway when Mr. Murakami made the alleged comment and that she was certain Coach Waters could hear the remark.  When an open spot in the routine became available after another member moved out of the District, all Dazzlers who had not been selected for the routine during the initial tryout were invited to audition for the open spot despite the fact that plaintiff had been named first alternate.  Nonetheless, plaintiff auditioned for and earned the spot

---

[3] Plaintiff contends that Coach Waters, defendant Fine and Mr. Murakami together made the July 2016 decision not to offer plaintiff a spot for the contemporary dance. On this point, she directs the court to her affidavit in which she states only that "Waters, Fine and Murakami told me that I did not make the final cut for the contemporary dance for the National Competition because I needed to work on my technique."  This statement does not support an inference that Mr. Murakami or defendant Fine participated in the decision.  Moreover, it contradicts plaintiff's deposition testimony in which she stated that Mr. Murakami did not say anything at all during the conversation in the hallway until after she was told that she had not been selected.

in the contemporary dance and performed in that dance during the school year. Coach Waters made the decision regarding plaintiff's spot in the contemporary dance.

Plaintiff did not report Mr. Murakami's comment to anyone in the District but she did tell her parents about it. Plaintiff's parents made no immediate effort to contact anyone at the District about the comment, but plaintiff's mother, Melodie Sturdivant, attempted to schedule a meeting with Coach Waters and Ms. Pressly about Mr. Murakami's comment and other issues related to the Dazzlers that were troubling to Mrs. Sturdivant, including financial management issues and the fact that plaintiff had to re-audition for a spot in the contemporary dance. That meeting never occurred based on, according to plaintiff, Coach Waters' refusal to make herself available. In September 2016, plaintiff's parents met with Ms. Pressly and Dr. Tyler Alexander, an Associate Principal at the high school, to discuss the Dazzlers program. Melodie Sturdivant testified that she reported Mr. Murakami's comment during that meeting. Everyone else who was present at the meeting, including plaintiff's father, Michael Sturdivant, testified that Mr. Murakami's name was never raised at the meeting and that his alleged comment was not mentioned in any respect at the meeting. Regardless, there is no evidence that Melodie Sturdivant reported anything about Ms. Fine as it related to Mr. Murakami's comment (*i.e.*, that Ms. Fine heard the comment and remained silent in the face of it).

The remainder of plaintiff's junior year and most of plaintiff's senior year passed without incident. During plaintiff's senior year, there were fourteen members of the Dazzlers team. One other member, a freshman, was African-American. In addition, defendant Fine's younger sister was a member of the team. In April 2018, plaintiff learned that she had been accepted as a member of the "Golden Girls" dance team at the University of Missouri, where she intended to enroll for

college for the next academic year.  Specifically, plaintiff earned a spot on the Golden Girls "men's squad"—the squad that performed at men's athletic events.  On May 1, 2018, plaintiff and the other members of the Dazzlers were practicing for their annual Spring Show, scheduled for May 3 and May 4, 2018.  During practice, two other team members were attempting to find the requisite music on defendant Fine's cell phone.  The record reflects that it was not uncommon for members of the Dazzlers to use defendant Fine's phone to find and play music for various routines and, in fact, defendant Fine shared her phone password with the Dazzlers for this purpose.  The two members who were searching for music on defendant Fine's phone handed the phone to plaintiff for assistance in locating the music.  According to plaintiff, the other members told her that they thought the music was in a text exchange between defendant Fine and Mr. Murakami.  When the phone was handed to plaintiff, the phone was unlocked and opened to a text exchange between defendant Fine and Mr. Murakami.  Plaintiff then saw the following text exchange between defendant Fine and Mr. Murakami:

Murakami:    I can't believe Maggie didn't make it again.  I'm heart broken.

Fine:           AND [PLAINTIFF] MADE MENS.  I can't talk about it.

Murakami:    THAT DOESN'T MAKE SENSE.  I'm so mad.

Fine:           It actually makes my stomach hurt.

Murakami:    [laughing emoji]

Fine:           Bc she's fucking black.  I hate that.

Murakami:    me too

With her own phone, plaintiff took photos of the text exchange and shared that exchange with her parents.  That evening, Melodie Sturdivant sent the picture of the text exchange to Ms. Pressly.

Ms. Pressly telephoned Melodie Sturdivant that evening and then called her immediate supervisor, Dr. Tonya Merrigan, and Dr. Amy Dillon, the Director of Human Resources for classified personnel for the District.

The next morning, on May 2, 2018, Ms. Pressly held a meeting with defendant Fine, Nacole Boan (the high school's assistant principal), and Dr. Dillon.  Dr. Dillon notified defendant Fine during that meeting that she was no longer the coach of the Dazzlers and that she was not permitted to attend or participate in any Dazzlers events at school, including the upcoming Spring Show.  The District, however, did not terminate defendant Fine's employment because, according to the District, Dr. Dillon believed that she was "walking a fine line with a free speech issue because Fine's text messages were private communications with Murakami."  Although Dr. Dillon advised defendant Fine that she had "fulfilled her contract" with the District, defendant Fine's contract did not end until May 12, 2018 and she was paid under the contract until that time.

Immediately after the May 2, 2018 meeting with defendant Fine, Ms. Pressly informed the members of the Dazzlers team that defendant Fine would no longer be coaching the team but that the Dazzlers would continue with the Spring Show.[4]  She delivered this message during the Dazzlers' first-hour practice.  The record reflects that Dazzlers were required to take this first-hour class as part of their regular schedule during the school day.  Dazzlers received letter grades in the fall semester for the class and a pass/fail designation in the spring semester.  Ms. Pressly did not explain to the team why defendant Fine had been relieved of her coaching duties. The record reflects that plaintiff and her parents initially did not want Ms. Pressly to disclose to the

---

[4] While Ms. Pressly arranged for two other District employees to coach the Dazzlers for the Spring Show, plaintiff's evidence indicates that no one filled that role.

team why defendant Fine would not be coaching the Spring Show and Ms. Pressly testified that she tried to honor their request to keep the matter quiet.  Later that afternoon, Ms. Pressly sent an email to team parents, including defendant Fine's mother (whose younger daughter was a member of the Dazzlers) informing them that defendant Fine was no longer going to be the coach of the Dazzlers.  The evidence suggests that some team parents had already received text messages from their daughters informing them that defendant Fine was no longer coaching the Dazzlers.

While the record is not entirely clear as to what occurred next, suffice it to say that some if not all of the team parents came to the conclusion that plaintiff and her parents were somehow to blame for defendant Fine's fate.  According to the record, some parents believed that defendant Fine had been punished because plaintiff "took a racial comment and blew it out of proportion." Viewed in plaintiff's favor, the evidence also suggests that defendant Fine, after being removed from her coaching duties, suggested to her younger sister that she "get everyone to boycott" plaintiff.  Specifically, defendant Fine's sister sent defendant Fine a text message on May 2, 2018 in which she stated that plaintiff had asked her to present flowers to her after the Spring Show— a tradition for graduating seniors.  According to the text message, defendant Fine's sister was no longer going to present flowers to plaintiff.  The exchange reads in pertinent part as follows:

> Sister: Originally Camille asked me to give her flowers
> But I'm not gonna anymore
>
> Fine:  Nooooooo your [sic] joking?!?!?
> Did she unask you
>
> Sister: I mean no
> She never said anything
> But like I feel like she honestly thinks I'm doing it still but I'm not
>
> Fine:  You can't

Get everyone to boycot [sic]

Defendants contend that the text message does not support an inference that defendant Fine told her sister to have "everyone" generally boycott plaintiff but, as explained below, the evidence concerning subsequent conduct by the Dazzlers and some Dazzlers parents supports the inference suggested by plaintiff.

On May 3, 2018, the team parents decided to cancel the team banquet that was scheduled to take place at the school on May 8, 2018.  Melodie Sturdivant contacted Ms. Pressly to advise her that the team banquet had been cancelled and that she believed that other team parents were planning an off-school-property dinner for the purpose of including defendant Fine and excluding plaintiff.  The record reflects that Ms. Pressly asked Ms. Boan to check in with the team parents to see whether they were planning an alternative event.  Ms. Boan contacted one of the mothers of a Dazzler.  According to Ms. Boan, she advised that mother that defendant Fine could not be included in any Dazzlers banquet regardless of the location of the event.  Ms. Boan avers that the mother told her that the District could not control who attended an off-property dinner.  Ms. Pressly then instructed the high school's bookkeeper to put a hold on all Dazzlers funds for the rest of the school year and to alert Ms. Pressly if anyone tried to spend those funds.  Ms. Pressly checked with the bookkeeper multiple times to make sure that the funds were only used for the Spring Show.[5]

---

[5] The evidence concerning Ms. Pressly's and Ms. Boan's efforts to ensure that Dazzlers funds were not utilized for any off-campus activities was not introduced until defendants' reply brief such that plaintiff has not had an opportunity to controvert it.  Nonetheless, the court includes those facts here because, while they have no bearing on the result in this case, they provide a more complete factual context for the off-campus activities.  Moreover, plaintiff has no evidence that school funds were utilized for any off-campus activities.

On the evening of May 3, 2018, just before the first Spring Show performance scheduled later that evening, all Dazzlers except plaintiff met at the home of one of the team parents. Defendant Fine was also present at the home.  One parent described the gathering as a "meeting" that was scheduled for the purpose of permitting the team to bond and support each other before the Spring Show.  Defendant Fine gave the girls a "pep talk" and "encouragement" about the show.  Plaintiff was not invited.  Plaintiff avers that, each year, defendant Fine gave an inspirational talk before the Spring Show and she believes that the gathering at the private home of a Dazzlers parent was held for the purpose of permitting defendant Fine to give her annual motivational, supportive talk before the Spring Show.  After the May 3, 2018 show, defendant Fine exchanged text messages with a team mother.  When defendant Fine texted that she missed seeing the Dazzlers perform that evening, the mom responded:  "Oh we know—and we all missed you SO much!  There is not one family on our team who doesn't support you!! (Minus the rat)." The mother testified that her use of the word "rat" likely referred to plaintiff and her family.

On May 4, 2018, the last night of the Spring Show, all the Dazzlers except plaintiff wore small purple ribbons on their costumes with the initials "CF" on them.  A mother of one of the Dazzlers made the ribbons to recognize and honor defendant Fine, though she testified that the ribbons did not bear initials.  No District employees were aware of the ribbons until after the show had ended.  Plaintiff avers that Ms. Pressly had told her mother that she would stay backstage during the Spring Shows to "protect" plaintiff, but plaintiff never saw Ms. Pressly during the shows.  Defendant Fine's mother, however, was backstage and her presence was uncomfortable for plaintiff.  Plaintiff avers that the other Dazzlers, except for the other African-American member, ignored her and would not speak to her during the Spring Shows.  After the final show,

some of the Dazzlers mothers took photos of the team, but plaintiff did not appear in those photos. Moreover, despite a team tradition of having one or more Dazzlers present flowers to and make remarks about Dazzlers who are graduating seniors, none of the Dazzlers presented flowers to or made remarks about plaintiff at the final show.  Ms. Pressly, however, purchased flowers for plaintiff, which were presented to plaintiff by friends.

Plaintiff avers that, by this time, none of the Dazzlers except the other African-American Dazzler would speak to her at all.  She avers that, prior to the time she found the text on defendant Fine's phone and her parents complained about the text, the Dazzlers had been not only her teammates but her friends.  On Saturday, May 5, 2018, Melodie Sturdivant contacted Ms. Pressly to notify her that the other dancers were ostracizing and ignoring plaintiff.  She asked that plaintiff be excused from her first-hour Dazzlers class for the remainder of the school year, which was essentially a study hall at that point because the Spring Show was over.  Ms. Pressly excused plaintiff from class.  Plaintiff did not attend her first-hour class for the four days that remained in the school year for graduating seniors.  Melodie Sturdivant avers that, by this time, she expected Ms. Pressly to inform the Dazzlers and their parents that defendant Fine had "exhibited racial prejudice against a dancer" in the hopes that the information would prevent the Dazzlers from further ostracizing and excluding plaintiff.

On May 8, 2018, Melodie Sturdivant heard from another school parent that the Dazzlers had gone to dinner together that evening.  The parent had seen photos of the Dazzlers, except plaintiff, on social media.  It is undisputed that all of the Dazzlers, except plaintiff, had dinner together that evening, on the night of the previously scheduled team banquet.  Defendant Fine was present at the dinner, as were several team parents.  No one invited plaintiff.  Ms. Sturdivant

10

alerted Ms. Pressly to the dinner, but the dinner was either already occurring or had ended by that time.  The parties have stipulated that Ms. Pressly did not know that the dinner was taking place and that she told plaintiff's mother that there was nothing she could do, especially as the dinner occurred without Dazzlers funds and off school property.

Plaintiff graduated from high school on May 12, 2018.  She held a graduation party and invited her teammates.  None of the Dazzlers attended the party except the other African-American member of the team.  Plaintiff remains on the Golden Girls dance team at the University of Missouri.

## II.      Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a).  A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted).  "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

## III.     Claims Against School District

In the pretrial order, plaintiff asserts claims of race discrimination and retaliation by the School District in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d and further seeks to the hold the District liable under 42 U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment Constitution.   The parties agree that the applicable legal standard here, whether under the Fourteenth Amendment or Title VI, is deliberate indifference.  *See Bryant v. Independent Sch. Dist. No. I-38*, 334 F.3d 928, 934 (10th Cir. 2003) (directing district court to apply same deliberate indifference standard to Title VI claim that Circuit applies to Title IX claims); *Murrell v. School Dist. No.1*, 186 F./3d 1238, 1249-50 910th Cir. 1999) (school district liability under Equal Protection Clause requires showing of deliberate indifference).   After an extensive review of Tenth Circuit and Supreme Court case law on the deliberate indifference standard for claims brought pursuant to Title IX, Title VI, and § 1983, this court has not uncovered any inconsistency in the "deliberate indifference" standard among these various claims.  Thus, whether plaintiff's claim is addressed under Title VI or as a policy, practice or custom claim under § 1983, the lack of deliberate indifference by the District defeats plaintiff's claims against the District.   *See Doe v. Galster*, 768 F.3d 611, 622 (7th Cir. 2014) (deliberate indifference analysis applied to Title VI and Title IX claims applied equally to equal protection claim); *Davis v. DeKalb County Sch. Dist*., 233 F.3d 1367, 1376 (11th Cir. 2000) (deliberate indifference standard under § 1983 is the same as that applied to Title IX); *Gebser v. Lago Vista Indep. Sch. Dist*., 524 U.S. 274, 290-91 (1998) (introducing "deliberate indifference" standard to Title IX and citing § 1983 case in support of that standard).

Title VI protects the right to be free from discrimination under a program that receives federal funding. 42 U.S.C. § 2000d.  To prove intentional racial discrimination under Title VI,

plaintiff must establish that the district had actual knowledge of, and was deliberately indifferent to, race discrimination that deprived the victim of access to the educational benefits or opportunities provided by the school. *Bryant*, 334 F.3d at 934. d. at 1246 (internal citation omitted and emphasis supplied).  The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." Denials of equal protection by a municipal entity or any other person acting under color of state law are actionable under 42 U.S.C. § 1983.  It is well established in the Tenth Circuit that race discrimination by a state actor can constitute a violation of the equal protection clause. *See Poolaw v. City of Anadarko, Okla.*, 660 F.2d 459, 462 (10th Cir.1981).  Plaintiff relies on the same evidence of deliberate indifference to support both claims.

The School District can incur liability for its employees' constitutional torts only if those torts resulted from a municipal policy or custom. *Murphy v. City of Tulsa*, 950 F.3d 641, 644 (10th Cir. 2019) (citing *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).  As the Circuit summarized in *City of Tulsa*, five potential sources exist for a municipal policy or custom:

1. a "formal regulation or policy statement,"

2. an informal custom amounting to a "widespread practice that, although not authorized by a written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law,"

3. the decision of a municipal employee with final policymaking authority,

4. a policymaker's ratification of a subordinate employee's action, and

5. a failure to train or supervise employees.

*Id*. (quoting *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010)).  "Through 'its deliberate conduct,' the municipality must have been the 'moving force' behind the injury." *Mocek v. City of Albuquerque*, 813 F.3d 912, 933 (10th Cir. 2015) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).  In the pretrial order and in her submissions, plaintiff seeks to hold the District liable based only on the District's failure to train Mr. Murakami and Ms. Fine about the District's specific anti-discrimination policies and race discrimination in general. In evaluating plaintiff's failure-to-train theory, the court bears in mind the Supreme Court's warning that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

> To satisfy the stringent deliberate indifference standard, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary'": "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id*. at 62 (quoting *Brown*, 520 U.S. at 409). Evidence of "a pre-existing pattern of violations" is only unnecessary "'in a narrow range of circumstances,'" "however rare," in which "the unconstitutional consequences of a failure to train" are "'highly predictable'" and "patently obvious." *Id*. at 63–64 (quoting *Brown*, 520 U.S. at 409).

*Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019).

Viewing the evidence in plaintiffs' favor, she has not shown the necessary pattern of similar constitutional violations to establish deliberate indifference on the part of the District. In fact, she does not even argue that there is a pattern of similar constitutional violations present here.  Rather, she asserts that there is a "pattern of not training coaches at all regarding discrimination."  This argument, as the District highlights, is misplaced.  The requisite focus is on a pattern of constitutional violations—not a pattern of failing to train.  *See id.*  It is the pattern of constitutional violations that gives notice to the District that a course of training is deficient in a particular

respect. *Id.* The only incidents in the record before the court are Mr. Murakami's July 2016 comment about plaintiff's skin color and, nearly two years later, the May 2018 text exchange between Ms. Fine and Mr. Murakami with the subsequent but related "boycott" text by Ms. Fine. Plaintiff, then, points to one incident of alleged race discrimination (the July 2016 comment) prior to the incident that gave rise to this lawsuit. The Circuit has expressly held that "[o]ne prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations." *Id.* at 1287 (quoting *Coffey v. McKinley Cty.*, 504 F. Appx. 715, 719 (10th Cir. 2012) and citing *Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987) ("One instance, however egregious, does not a pattern or practice make.")).

In the absence of a pattern of constitutional violations, plaintiff must show that the need for training was so obvious that a violation of her constitutional right to equal protection was likely to result from not providing it. *See Parker v. City of Tulsa*, 745 Fed. Appx. 79, 82 (10th Cir. 2018). The Supreme Court has summarized the showing of "obviousness" as follows:

> In *Canton*, the Court left open the possibility that, "in a narrow range of circumstances," a pattern of similar violations might not be necessary to show deliberate indifference. *Bryan Cty.*, 520 U.S. at 409. The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. *Canton*, 489 U.S. at 390, n.10. Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights. *Bryan Cty.*, 520 U.S. at 409. The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.

15

> Failure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton*'s hypothesized single-incident liability. The obvious need for specific legal training that was present in the *Canton* scenario is absent here. Armed police must sometimes make split-second decisions with life-or-death consequences. There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require. Under those circumstances there is an obvious need for some form of training.

*Connick*, 563 U.S. at 63-64 (alterations omitted).  Thus, "[w]here the proper response . . . is obvious to all without training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise." *Walker v. City of New York*, 974 F.2d 293, 299–300 (2d Cir. 1992).  In the context presented here, courts have recognized that the illegality of race discrimination and retaliation is patently obvious to all and, accordingly, have rejected failure-to-train claims based on a municipality's failure to train employees on those topics.  *See Jackson v. City of Centreville*, 899 F. Supp. 2d 1209, 1221 (N.D. Ala. 2012) ("The court finds that the "proper response"—race discrimination is not allowed—is obvious to all without any special training.") *Young v. Pleasant Valley Sch. Dist.*, 2010 WL 55711, at *10 (M.D. Pa. Jan. 4, 2010), *aff'd*, 601 Fed. Appx. 132 (3d Cir. 2015) ("The court finds that the failure to provide specific training to employees on how not to retaliate does not amount to 'deliberate indifference to the rights of persons with whom the [district administrator] come[s] into contact.'  The offending conduct here—retaliation—is the sort of behavior that is so obviously wrong and contrary to right that an ordinary person could recognize it as inappropriate even without any additional training, and thus failing to provide more training on retaliation would not obviously lead to a constitutional violation and does not constitute deliberate indifference.") (internal citation omitted)).

16

Because plaintiff's evidence does not establish deliberate indifference on the part of the District, summary judgment is granted in favor of the District on plaintiff's § 1983 claim. Similarly, because the evidence does not show that any official with authority to address the alleged discrimination acted with deliberate indifference to that discrimination (as described more fully below in connection with plaintiff's claim against defendant Amy Pressly), summary judgment is granted in favor of the District on plaintiff's Title VI claim.

## IV.    Ms. Pressly's Liability under Section 1983

Plaintiff seeks to hold defendant Amy Pressly liable for Mr. Murakami's and Ms. Fine's alleged constitutional violations under a theory of supervisory liability.  This claim requires proof that Ms. Pressly personally committed a constitutional violation. *See Keith v. Koerner*, 843 F.3d 833, 837–38 (10th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.")). Thus, it is not enough that Ms. Pressly acted in a supervisory role when the alleged violations were committed. *See id.* (citing *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)). Rather, plaintiff must show an "affirmative link" between Ms. Pressly and the constitutional violations, which requires proof of three interrelated elements: (1) personal involvement; (2) causation; and (3) state of mind. *Id.* at 838 (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013)).  These elements are not "distinct analytical prongs, never to be intertwined." *See Dodds*, 614 F.3d at 1199 n.8.  As will be explained, the facts presented in the summary judgment record taken in the light most favorable to plaintiff do not

17

establish that Ms. Pressly violated plaintiff's constitutional rights.  Summary judgment, then, is required on this claim.[6]

Before the Supreme Court's decision in *Iqbal*, a § 1983 plaintiff had some flexibility in how to establish a supervisory defendant's personal involvement: she could do so by showing personal participation; exercise of control or direction; failure to supervise; or "promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights." *Keith*, 843 F.3d. at 838 (citing *Dodds*, 614 F.3d at 1195).  In this case, plaintiff seeks to establish Ms. Pressly's personal involvement based on her purported failure to train and supervise Ms. Fine and Mr. Murakami and her failure to intervene when the Dazzlers ostracized plaintiff at Ms. Fine's purported direction.  It is unclear whether these theories of supervisory liability under § 1983 have survived the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  *See id.*  ("[W]e have not determined whether a failure to train satisfies the post-*Iqbal* personal-involvement requirement.").[7]  The court need not address that question here because plaintiff's claim fails to satisfy the Tenth Circuit's pre-*Iqbal* standards.

Under that standard, plaintiff, as with her claim against the District, must establish that Ms. Pressly acted with deliberate indifference.  *See Dodds*, 614 F.3d at 1196 n.4 ("After *Canton*, 'deliberate indifference or reckless disregard' became the primary governing standard for supervisory liability."); *Vasquez v. Davis*, 2016 WL 6997261, at *2 (D. Colo. Nov. 30, 2016) ("[T]he Tenth Circuit has all but held that the law of supervisory liability for failure to train or

---

[6] For this reason, Ms. Pressly is also entitled to qualified immunity on plaintiff's claim against her.
[7] Traditionally, claims of "[f]ailure to supervise and failure to train are treated the same in the Tenth Circuit." *A.B. ex rel. B.S. v. Adams–Arapahoe 28J Sch. Dist.*, 831 F.Supp.2d 1226, 1245 (D. Colo. 2011).

intervene is functionally interchangeable with the law of *Monell* liability for similar failures."). The deliberate indifference standard may be satisfied when the supervisor "has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). While notice in most instances is established by proving a pattern of tortious conduct, "[i]n a narrow range of circumstances,  . . . deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Id*.  As described above in connection with plaintiff's claim against the District, the evidence viewed in plaintiff's favor does not establish a pattern of tortious conduct.  Moreover, no jury could reasonably infer that the alleged violations here were a highly predictable or plainly obvious consequence of Ms. Pressly's action or inaction.

Even assuming Ms. Pressly was notified in September 2016 about Mr. Murakami's July 2016 comment, there is no basis to conclude that Ms. Fine's conduct almost two years later was "highly predictable" in the absence of training.  This is particularly true because there is no evidence that Ms. Pressly was notified at any time that Ms. Fine heard Mr. Murakami's comment or was present when he allegedly made that comment.  Thus, the evidence does not support an inference that Ms. Pressly was on notice of a need to train or supervise Ms. Fine based on the July 2016 comment allegedly made by Mr. Murakami.  Plaintiff does not suggest that there were any instances of racial discrimination in the school between July 2016 and May 1, 2018, when plaintiff discovered Ms. Fine's text message.  Ms. Pressly's response to that text message was undisputedly swift.  Within hours, Ms. Pressly took steps to relieve Ms. Fine of her coaching duties and to

prohibit her from returning to the school for any purpose.  Significantly, the record is devoid of any evidence that, after that time, Ms. Pressly knew of any further misconduct by Ms. Fine.  There is no evidence that Ms. Pressly knew about Ms. Fine's "boycott" text until this litigation.  Although Melodie Sturdivant notified Ms. Pressly on May 3, 2018 and May 5, 2018 that the Dazzlers were ostracizing and ignoring plaintiff, there is no evidence that Ms. Pressly was aware that defendant Fine had encouraged that conduct.  Stated another way, there is no evidence that Ms. Pressly, after relieving defendant Fine of her coaching duties on May 2, 2018, knew that defendant Fine had engaged in any conduct that might implicate plaintiff's Equal Protection rights.  *See Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1250 (10th Cir. 1999) (for supervisory liability under equal-protection theory, plaintiff must show that supervisor actually acquiesced in discriminatory conduct).  In the absence of such evidence, no reasonable jury could conclude that Ms. Pressly had any personal involvement in any alleged constitutional violation or that she acted with deliberate indifference to plaintiff's Equal Protection rights.  Summary judgment in favor of defendant Amy Pressly is granted.

## V.     Defendant Fine's Liability under Section 1983

Lastly, plaintiff sets forth a claim of race discrimination against defendant Fine under the Equal Protection Clause of the Fourteenth Amendment.  In her motion for summary judgment, defendant Fine asserts that summary judgment in her favor is warranted because plaintiff cannot establish that she suffered a violation of her constitutional rights; that defendant Fine, as a matter of law, was not acting under color of state law at the time of the alleged constitutional violation; and that defendant Fine is entitled to qualified immunity from plaintiff's claim.  As will be

20

explained, defendant Fine has not shown that she is entitled to summary judgment on the issue of whether plaintiff has established a constitutional violation and factual issues exist as to whether defendant Fine was acting under color of state law at the time of the alleged violation. Moreover, because plaintiff has satisfied her burden of showing that Tenth Circuit precedent clearly establishes the unlawfulness of defendant Fine's alleged conduct, the court rejects defendant Fine's argument that she is entitled to qualified immunity for the asserted violation. The court, then, denies defendant Fine's motion for summary judgment.[8]

*Constitutional Violation*

The Equal Protection Clause of the Fourteenth Amendment "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) and citing *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998) ("In order to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them.")). Thus, to establish an equal protection violation, plaintiff must come forward with evidence that defendant Fine treated her

---

[8] Defendant Fine suggests that plaintiff, as a matter of law, cannot establish her claim because the other African-American dancer on the team was undisputedly not excluded from any activities, negating any inference that any action was taken against plaintiff based on race. Defendant Fine cites no authority suggesting that her neutral treatment of one member of a protected class is fatal to a claim of discrimination alleged by another member of that same protected class.

differently than other similarly situated members of the dance team and that defendant Fine was motivated by racial animus. *Id.*

Neither party has set forth any framework for analyzing whether plaintiff's evidence is sufficient to establish a constitutional violation and the court has not uncovered any Tenth Circuit cases that are particularly helpful under the facts of this case—*i.e.*, one in which a teacher or coach is alleged to have engaged in racial discrimination against a student in violation of the Equal Protection Clause.  In the context of an equal protection claim alleging sexual harassment in an educational setting, the Circuit has applied Title VII standards.  *See, e.g., Doe v. Hutchinson*, 728 Fed. Appx. 829 (10th Cir. Mar. 30, 2018).  Other courts in analogous contexts have applied the *McDonnell-Douglas* burden-shifting analysis and, consistent with that approach, have required a showing of an adverse action.  *See, e.g., Arceneaux v. Assumption Parish Sch. Board*, 733 Fed. Appx. 175 (5th Cir. 2018) (assuming without deciding that Title VII framework applied to Equal Protection gender discrimination claims in educational setting); *Thompson v. Ohio State Univ.*, 92 F. Supp. 3d 719, 729-30 (S.D. Ohio Feb. 20, 2015).  This is consistent with Tenth Circuit law in the analogous Title VI context.  *See Bryant v. Independent Sch. Dist. No. I-38*, 334 F.3d 928, 930 (10th Cir. 2003) (using Title VII burden of proof for Title VI claims and remanding for district court to apply standard that included whether plaintiff was deprived of access to educational benefits or opportunities); *Gratz v. Bollinger*, 539 U.S. 244, 275-76 n.23 (2003) (discrimination that violates that Equal Protection Clause committed by an institution that accepts federal funds also constitutes a violation of Title VI); *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 557 (3d Cir. 2011) ("Title VI . . . prohibitions against discrimination are coextensive with those of the Equal Protection Clause.").

Nonetheless, the court need not decide what specific analytical framework applies to plaintiff's claim because it is clear—and the parties agree—that plaintiff, to establish a violation of the Equal Protection Clause against defendant Fine, must come forward with evidence that defendant Fine deprived plaintiff of an educational benefit or opportunity. *See Lambert v. Board of Trustees of University of Alabama*, 2019 WL 339178, at 10 (N.D. Ala. Jan. 28, 2019) (to prevail on § 1983 equal protection claim in educational setting, plaintiff must show some adverse educational action); *Thompson*, 92 F. Supp. 3d at 730 (plaintiff must prove she "suffered an adverse action at the hand of the defendants in her pursuit of her education"); *Doe v. Los Angeles Unified Sch. Dist.*, 2017 WL 797152, at 18 (C.D. Cal. Feb. 27, 2017) (teacher's verbal harassment of African-American students and resulting public denigration was sufficient to deprive students of equal access to educational opportunities).

In her motion for summary judgment, defendant Fine asserts that the constitutional question is easily resolved in her favor because it is undisputed that defendant Fine did not exclude plaintiff from the May 3, 2018 gathering at a parent's home or the May 8, 2018 dinner. Rather, the evidence, in defendant Fine's view, demonstrates that team parents and/or team members excluded plaintiff. According to defendant, then, no reasonable jury could find a constitutional violation because there is simply no evidence that defendant Fine excluded plaintiff from any activity. Defendant Fine, however, has not come to grips with the thrust of plaintiff's claim against defendant Fine—that defendant's "fucking black" text followed by her "boycott" directive set in motion various events that deprived plaintiff of the full benefit of her participation on the school-sponsored Dazzlers, beginning with the May 3, 2018 meeting and culminating in the last

week of school when plaintiff stopped attending her first-hour class because the Dazzlers had ostracized her.

Defendant mentions these incidents in a footnote for the sole purpose of highlighting that such actions are, at best, acts of alleged retaliation and that plaintiff does not have a viable retaliation claim against defendant Fine.[9]  But the fact that plaintiff does not have a pure retaliation claim against defendant Fine does not render those allegations meaningless.  Plaintiff's race discrimination claim against defendant Fine is not limited to the initial text message and the two off-campus team meetings but includes the "boycott" text and the conduct of the Dazzlers following that text.  While defendant may characterize those other incidents as, at most, retaliatory, a jury is not bound by defendant's characterization of the evidence.  Thus, because defendant has not engaged in any analysis of whether a reasonable jury could analyze plaintiff's evidence, taken as a whole, and determine that defendant Fine's conduct was based on plaintiff's race or whether a reasonable jury could find that plaintiff's evidence, taken as a whole, amounts to a deprivation of an educational benefit, defendant has simply not met its burden on summary judgment to show the absence of a constitutional violation.

*Under Color of State Law*

Defendant Fine moves for summary judgment on the grounds that, as a matter of law, her actions simply cannot be considered actions of the state.  She emphasizes that she had been relieved of her coaching duties on May 2, 2018; the District made it known to the Dazzlers and

---

[9] The magistrate judge assigned to this case denied as untimely plaintiff's motion for leave to file an amended complaint in which she sought to add a retaliation claim against defendant Fine.

their parents that defendant Fine was no longer serving as a coach of the Dazzlers; and there is simply no nexus between her conduct and her employment with the District.  Nonetheless, the evidence viewed in the light most favorable to plaintiff permits a reasonable inference that there was a "real nexus" between defendant Fine's conduct and her authority as a District employee such that she was acting under color of state law for purposes of plaintiff's § 1983 claim.  *Schaffer v. Salt Lake City Corp*., 814 F.3d 1151, 1155 (10th Cir. 2016) ("Whether a defendant acted under color of state law is a mixed question of fact and law.").

Under Section 1983, liability attaches only to conduct occurring "under color of law." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." *Jojola v. Chavez*, 55 F.3d 488, 493 (10th Cir. 1995). To find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" *Gallagher*, 49 F.3d at 1447 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

In the public-employee context, the Tenth Circuit has recognized that "state employment is generally sufficient to render the defendant a state actor." *Jojola*, 55 F.3d at 493.  That principle is important here, of course, because it is undisputed that the District did not terminate defendant Fine's employment on May 2, 1018.   Her contract with the District did not expire until mid- to late May.  So while the District advised defendant Fine that she had fulfilled her contractual

obligations to it as of May 2, 2018, she was still on the District's payroll at the time of alleged incidents here.  *Cf. D.T. v. Indep. Sch. Dist. No. 16*, 894 F.2d at 1186-66 (10th Cir. 1990) (defendant teacher did not act under color of state law when he engaged in the activity alleged to have violated the plaintiff's constitutional rights; conduct occurred during summer vacation, on private property, while teacher was not under contract with the District).  At the same time, it is "well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state." *Jojola*, 55 F.3d at 493 (quoting *Lugar*, 457 U.S. at 935-36 n.18; *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3d Cir. 1995)). Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." *Jojola*, 55 F.3d at 493.

In the circumstances presented here, a jury could find the requisite nexus between the violation allegedly committed by defendant Fine and her misuse of her authority as a District employee.  Viewing the evidence in the light most favorable to plaintiff, defendant Fine continued to act like the head coach of the Dazzlers (and, of course, remained a District employee) in certain material respects even after the District purported to relieve her of those duties on May 2, 2018. That same day, she sent the "boycott" text to her younger sister, also a Dazzler.  A jury could find that she sent the "boycott" text to her sister not in her capacity as an older sister but in her capacity as the coach of the team with the apparent authority to provide that directive.  And to the extent the team abided by that directive, they arguably did so not because defendant Fine was the older sister of a teammate, but because she was the person they viewed and respected as the head coach of their team.  After the "boycott" directive, team parents and/or members planned what was

essentially a team meeting at the home of a Dazzler parent.  Viewed in her favor, plaintiff's evidence suggests that she was purposefully excluded from that meeting.  Yet defendant Fine attended the meeting for the purpose of providing her traditional motivational speech to the team before the Spring Show.  In other words, defendant Fine continued to invoke her authority as the head coach.  There is little doubt that, when she attended that event, she was acting like the head coach of the Dazzlers and the Dazzlers viewed her as such.  Defendant Fine continued to communicate regularly with the Dazzlers and their parents during this time frame.  And there is no evidence that any other District employee stepped in to fill the coaching role, which supports an inference that defendant Fine was, in fact, continuing to act as the head coach despite the District telling her that she was relieved of those duties.  A jury could also find that defendant Fine's "boycott" directive spilled over into the school environment itself, where Dazzlers ostracized plaintiff during the Spring Show and in their required first-hour class.  In sum, a jury could find that defendant Fine, while under contract with the District, misused her apparent authority as the head coach of the Dazzlers to cause injury to plaintiff such that requisite nexus exists to support a finding that defendant Fine acted under color of state law.  Defendant's motion is denied on this issue.  *See Doe v. Fournier*, 851 F. Supp. 2d 207, 220-21 (D. Mass. 2012) (holding that a reasonable juror could conclude that the defendant was acting under color of state law based on the plaintiff's allegations that the defendant had the opportunity to harass the plaintiff by virtue of his authority as a high school guidance counselor and football coach, notwithstanding the fact that his actions were not authorized – and even were prohibited – by the school).

*Qualified Immunity*

Defendant Fine asserts that she is entitled to summary judgment on plaintiff's claim based on qualified immunity.  Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Thomas v. Durastanti*, 607 F.3d 655, 661 n.4 (10th Cir. 2010) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  When a defendant asserts qualified immunity at summary judgment, the "burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Courtney v. Oklahoma ex rel. Dep't of Public Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)).  When, as here, a defendant asserts qualified immunity at the summary judgment stage, the court's factual analysis relative to the qualified-immunity question is distinct:

> [T]he objective is not to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury. Instead, the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court.

*Cox v. Glanz*, 800 F.3d 1231, 1243 (10th Cir. 2015) (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring)). The "universe of facts" is comprised of uncontested facts and contested material facts favorable to the party claiming injury. *Weigel v. Broad*, 544 F.3d 1143, 1156 (10th Cir. 2008) (O'Brien, J., dissenting). After the universe of relevant facts is distilled from the record, the court determines whether those facts "demonstrate" the violation of a clearly established constitutional right. *Id.*

As explained above, defendant Fine has not satisfied her burden of showing that plaintiff cannot establish a constitutional violation.  For purposes of qualified immunity, the burden on this

issue shifts to plaintiff to show the violation of a constitutional right.  But the Circuit has described this burden as the need to "rebut" the defendant's "no-constitutional-violation arguments."  *See Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015).  Because defendant has not shouldered her burden in the first instance, there is no substantive argument for plaintiff to rebut.  Defendant's qualified immunity defense, then, necessarily turns on the "clearly established" prong.  A "clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he [or she] is doing violates that right."  *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (citations omitted).  As the Circuit has summarized:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The dispositive question is whether the violative nature of the particular conduct is clearly established.  Accordingly, the Supreme Court has repeatedly admonished circuit courts "not to define clearly established law at a high level of generality."  Though "a case directly on point" is not required, "existing precedent must have placed the constitutional question regarding the illegality of the defendant's conduct beyond debate."
>
> Ordinarily . . . there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.  But when a public official's conduct is so egregious even a general precedent applies with "obvious clarity," the right can be clearly established notwithstanding the absence of binding authority involving materially similar facts.

*Id*. at 1291-92 (citations and quotations omitted).

In her response to defendant Fine's motion for summary judgment, plaintiff relies primarily on general principles of Equal Protection jurisprudence.  *See, e.g., McLaurin v. Oklahoma State Regents for Higher Education*, 339 U.S. 637, 624 (1950).  But the issue here is not whether plaintiff had a right to be free from race discrimination in a public school—clearly, she did.  Instead, the issue is whether clearly established law exists such that defendant Fine as a reasonable

official would understand that her actions would violate plaintiff's Equal Protection rights.  On that issue, plaintiff directs the court to three cases—*Sherwin Manor Nursing Center v. McAuliffe*, 37 F.3d 1216 (7th Cir. 1994); *Ramirez v. Department of Corrections*, 222 F.3d 1238, 1243-44 (10th Cir. 2000); and *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 140 (2d Cir. 2014).   The court finds that *Ramirez* is sufficient to have placed the constitutional question regarding the illegality of defendant Fine's conduct beyond debate.[10]

In *Ramirez*, the plaintiffs, Hispanics of Mexican-American origin and employees of the Colorado Department of Corrections, alleged that their employer subjected them to harsher disciplinary actions and other adverse employment actions based on their race and national origin. 222 F.3d at 1240.  The defendants raised qualified immunity at the motion to dismiss stage and the district court denied the motion. *Id*. at 1240-41.  The Tenth Circuit affirmed, recognizing that the law underlying the plaintiffs' Equal Protection claims—that public employers cannot engage in employment practices based on race or national origin—was clearly established at the time of the alleged violations, a notion that the defendants conceded. *Id*. at 1243-44.  Defendant Fine, of course, was not plaintiff's employer but the relationship is certainly analogous.  Moreover, as noted above in connection with the failure-to-train claims against the District, the illegality of race discrimination in a public school setting is patently obvious and *Ramirez* serves to drive that point home.  If, as plaintiff contends, defendant Fine, based on plaintiff's race, began a concerted effort to have plaintiff excluded from Dazzlers activities and ostracized at school, then the violative nature of that conduct is clearly established as extracted from *Ramirez.* In other words, even in

---

[10] *Sherwin Manor* and *Turley* are factually distinct in significant ways and neither would put defendant Fine on notice that her actions violated plaintiff's constitutional rights.

the absence of binding authority involving identical facts, the court believes that the precedent in *Ramirez* applies with obvious clarity to the facts presented here. Suffice it to say, there is evidence from which a jury could reasonably conclude that defendant Fine, while acting under color of state law, intentionally deprived plaintiff of educational benefits based on race; if a jury credits that evidence, then that violation is clearly established in the Tenth Circuit. Because plaintiff has met her burden to show that, if the facts are as plaintiff's evidence supports, defendant Fine violated clearly established law, qualified immunity does not protect defendant Fine from liability in her individual capacity. [11]

## VI.   Exhibits Filed Under Seal

In connection with filing her responses to the motions for summary judgment, plaintiff filed a motion for leave to file all deposition transcripts under seal. To expedite the processing of the motions for summary judgment, the court granted the motion in part and retained the motion under advisement, indicating that it would resolve the sealing issue after a ruling on the merits of the motions for summary judgment. To the extent plaintiff's motion to file under seal remains under advisement, it is now denied. Plaintiff has not overcome the presumption in favor of public access. *United States v. Pickard*, 733 F.3d 1297, 1302 (10th Cir. 2013). The only reason articulated by plaintiff is a vague reference to the protective order in this case, which has no

---

[11] Defendant Fine's final argument in support of summary judgment is that a judgment against her would violate her First Amendment rights. The court rejected this argument at the motion to dismiss stage and does so again here. Plaintiff's claim against defendant Fine is not based solely on her private text messages but on defendant Fine's role in depriving plaintiff of certain educational benefits. The text messages properly serve as evidence to support that claim.

bearing on whether a document should be maintained under seal.  Moreover, the court relied heavily on the deposition transcripts in resolving the motions for summary judgment, which clearly weighs in favor of public access.  *Id*.  The Clerk of the Court, then, is directed to unseal the sealed exhibits attached to plaintiff's responses (docs. 148, 149) to the motions for summary judgment.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the School District's and Amy Pressly's motion for summary judgment (doc.  133) is granted; defendant Carley Fine's motion for summary judgment (doc. 141) is denied; Kevin Murakami's motion for summary judgment (doc. 139) is moot; and plaintiff's motion for leave to file under seal (doc. 151) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** the Clerk of the Court shall unseal the sealed exhibits attached to plaintiff's responses (docs. 148, 149) to the motions for summary judgment.

**IT IS SO ORDERED.**

Dated this 30th  day of June, 2019, at Kansas City, Kansas.

*s/ John W. Lungstrum*
John W. Lungstrum
United States District Judge